UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **RUSSELL C. GOVETT IV**, <br><br> Petitioner, <br><br> vs. <br><br> **CHRIS KING,** <br><br> Respondent. | **2:22-CV-12579-TBG-EAS** <br><br> **OPINION & ORDER DENYING HABEAS PETITION, DENYING A CERTIFICATE OF APPEALABILITY, DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL** |

Michigan prisoner Russell Charles Govett IV ("Govett") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Govett was convicted of two counts of first-degree murder, one count of second-degree murder, larceny in a building, felon in possession of a firearm, and possession of a firearm during the commission of a felony following a jury trial in the Wayne County Circuit Court in 2017. He was sentenced to concurrent terms of life in prison without the possibility of parole on the first-degree murder convictions, a concurrent term of life in prison with the possibility of parole on the second-degree murder conviction, a concurrent term of two to four years in prison on the larceny conviction, a concurrent term of two to five years in prison on the felon in

1

possession conviction, and a consecutive term of two years in prison on the felony firearm conviction in 2018.

In his habeas petition, Govett raises claims concerning the admission of his custodial statements, the use of his post-arrest silence, the admission of testimony regarding his parolee status, and the conduct of the prosecutor as to the disclosure of evidence and discovery. For the reasons stated, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the habeas petition, **DENIES** a certificate of appealability, and **DENIES** leave to proceed in forma pauperis on appeal.

## I.    FACTS & PROCEDURAL HISTORY

Govett's convictions arise from the bludgeoning of two men and the robbery and shooting of a third man at a drug house in Detroit, Michigan in 2017. The Michigan Court of Appeals described the relevant facts, which are presumed correct on habeas review, 28 U.S.C. 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> Defendant's convictions arise from the February 3, 2017 deaths of housemates Bruce Nicaise, Paul McBride, and Eric Bouford at a drug house on Sherwood Street in Detroit. Two days earlier, defendant drove his mother, Denise Sinclair, and his sister, Rachel Miller, to the house to purchase drugs from McBride. Sinclair gave McBride the keys and title to her

2

Chevrolet Impala as security for the purchase. After Sinclair left, defendant and Miller remained at the house and requested from McBride more drugs but McBride was unwilling to sell more drugs without payment. Later that day, McBride left the house and defendant became involved in an argument with Nicaise because Nicaise intended to sell the Impala before defendant could pay the underlying drug debt. At some point, the argument escalated and defendant struck both Bouford and Nicaise with a log-splitting maul, killing them. Defendant claimed that he acted because Bouford reached for a shotgun, and Nicaise produced a handgun. McBride returned to the home after defendant had killed Bouford and Nicaise, and Jordan Hering also arrived at the same time to buy drugs. Defendant then shot McBride, and then he and Miller proceeded to clean the house with bleach. Defendant stole pills and cash from McBride's person.

After defendant found the title and keys to Sinclair's Impala, defendant and Miller rode with Hering and Hering's friend, Derek Glowacki, to the location where McBride had parked the Impala. Defendant and Miller then drove to Cape May, New Jersey where he remained until captured by police. Detroit Police Detective Moises Jimenez transported defendant back to Michigan. After advising defendant of his *Miranda* rights, defendant initially refused to speak, but he then said that if he received written confirmation that Miller would not be charged, he would give the police all the information he had about what happened at the Sherwood house.

Hering was reluctant to contact the police after the offense because he had violated his parole by going to a drug house and because defendant had taken Hering's driver's license and threatened him if he went to the police. On February 4, Hering returned to the Sherwood house to look for drugs. He took McBride's cell phone and used it to send an anonymous text message to one of McBride's contacts, to inform her that McBride and his housemates had been killed.

3

> Defendant was charged with first-degree premeditated murder and first-degree felony-murder for the three homicides, felon in possession of a firearm, larceny in a building, and felony-firearm. Defendant represented himself in all phases of the proceedings, assisted by court-appointed standby counsel. The defense theory at trial was self-defense. Defendant testified that he killed Nicaise and Bouford because he thought they intended to shoot him during the argument about the Impala. He stated that he shot McBride because he thought McBride would kill him and Miller after McBride discovered that Nicaise and Bouford had been killed. The jury found defendant guilty of first-degree premeditated murder for the deaths of Nicaise and McBride, and second-degree murder for Bouford's death. The jury also found defendant guilty of larceny from a building, and the felon-in-possession and felony-firearm charges. Defendant moved for an evidentiary hearing and a new trial, alleging that the prosecutor withheld exculpatory evidence. Following an evidentiary hearing, the trial court denied the motion.

*People v. Govett*, No. 342639, 2020 WL 2501518, *1–2 (Mich. Ct. App. May 14, 2020) (footnote citation omitted).

Following his convictions and sentencing, Govett filed a motion for a new trial and evidentiary hearing with the state trial court, which granted the evidentiary hearing request, conducted the hearing, and denied the motion for new trial. 2/22/19 Evid. Hrg. Tr., ECF No. 10-18.

Govett also filed an appeal of right with the Michigan Court of Appeals raising several claims, including those presented on habeas review, through counsel and in a pro se brief. The court denied relief on

those claims and affirmed his convictions and sentences. *See Govett*, 2020 WL 2501518 at \*2–16. Govett then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *See People v. Govett*, 508 Mich. 894, 962 N.W.2d 288 (2021).

Govett thereafter filed his federal habeas petition. He raises the following claims:

I.      His custodial statement was utilized at trial in violation of his right to counsel.

II.     The prosecutor's use of his post-*Miranda* silence violated his due process rights.

III.    The prosecutor questioned a witness concerning his (Govett's) status as a parolee.

IV.     The prosecutor violated his rights to due process and a fair trial by withholding exculpatory evidence and by not making discovery materials available at a reasonable time before trial.

Pet., ECF No. 1. Respondent filed an answer to the petition contending that it should be denied because certain claims are procedurally defaulted and because all of the claims lack merit. Ans., ECF No. 9.

## II.    LEGAL STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of

review that federal courts must use when considering habeas petitions brought by prisoners challenging their state convictions. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1)

6

permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520–521 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333 n.7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief

does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Under § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*; *see also White v. Woodall*, 572 U.S. 415, 419–420 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). A petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, 576 U.S. 113, 118 (2016).

8

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125–126 (2008) (per curiam)); *Lockyer*, 538 U.S. at 71–72. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of clearly established law are to be determined solely by Supreme Court precedent. Thus, "circuit precedent does not

constitute 'clearly established Federal law, as determined by the Supreme Court,'" and it cannot provide the basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360–361 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. DISCUSSION

#### A. Procedural Default

As an initial matter, Respondent contends that several of Govett's claims are procedurally defaulted due to his failure to object at trial. The

Court declines to address this defense. It is not a jurisdictional bar to review of the merits. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). Federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The Supreme Court has explained the rationale behind such a policy: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. Such is the case here. The procedural issue is intertwined with the underlying claims—and the substantive issues are more readily decided on the merits. Accordingly, the Court shall proceed to the merits of the habeas claims.

## B. Merits

### 1. Admission of Custodial Statement

Govett first asserts that he is entitled to habeas relief because the trial court admitted his custodial statement into evidence in violation of

his rights to counsel and to remain silent. Respondent contends that this claim lacks merit.

The Fifth Amendment to the United States Constitution protects an accused from compulsory self-incrimination. U.S. Const. amend. V; Malloy v. Hogan, 378 U.S. 1 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."). The prohibition against compelled self-incrimination requires that a custodial interrogation be preceded by advice that the suspect has the right to counsel and the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 432 (2000) ("*Miranda* and its progeny ... govern the admissibility of statements made during custodial interrogation in both state and federal courts."). The *Miranda* safeguards come into play whenever a person is in custody and subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Interrogation means express questioning or its "functional equivalent," which is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and

custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300–301.

If a suspect invokes the right to counsel, "the interrogation must cease until an attorney is present." *Miranda,* 384 U.S. at 474. When a suspect has invoked the right to counsel during custodial interrogation, the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–485 (1981). The request for counsel must be express and unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994). If a suspect's reference to counsel is ambiguous or equivocal, the police have no obligation to stop questioning the suspect. *Id.* A suspect must sufficiently articulate his or her desire for counsel so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. *Id.*

Although *Davis* concerned the right to counsel, "every circuit that has addressed the issue squarely has concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain

13

silent," *Bui v. DiPaola*, 170 F.3d 232, 239 (1st Cir. 1999) (collecting cases),

including the United States Court of Appeals for the Sixth Circuit, *see United States v. Hurst*, 228 F.3d 751, 759–760 (6th Cir. 2000) (ruling that a suspect's invocation of the right to remain silent must be unequivocal to require that police questioning cease); *United States v. Hicks*, 967 F. Supp. 242, 249–250 (E.D. Mich. 1997) (Rosen, J.).

The Michigan Court of Appeals considered this claim on direct appeal and denied relief. The court explained:

> Both the federal and state Constitutions guarantee a person's right against self-incrimination. U.S. Const., Am. V; Const. 1963, art. 1, § 17; *People v. Barritt*, 325 Mich. App. 556, 561; 962 N.W.2d 811 (2018). Law enforcement officers must therefore advise a defendant of his constitutional rights before subjecting him to a custodial interrogation. *Id.* During a custodial interrogation, if an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473–474; 86 S. Ct. 1602; 16 L. Ed. 2d 694 (1966). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v. White*, 493 Mich. 187, 195; 828 N.W.2d 329 (2013), quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–302; 100 S. Ct. 1682; 64 L. Ed. 2d 297 (1980). "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives his Fifth Amendment right" to remain silent. *People v. Howard*, 226 Mich. App. 528,

14

538; 575 N.W.2d 16 (1997). Once a defendant waives his rights and answers questions, the police are only required to stop questioning when the defendant unequivocally invokes his right to remain silent. *People v. Davis*, 191 Mich. App. 29, 36; 477 N.W.2d 438 (1991). A "defendant cannot have it both ways—he cannot choose to speak and at the same time retain his right to remain silent." *Id.*

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and ... the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457; 114 S. Ct. 2350; 129 L. Ed. 2d 362 (1994). If a suspect "effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Id.* at 458. "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* "However, the defendant's invocation of his right to counsel must be unequivocal." *People v. Tierney*, 266 Mich. App. 687, 711; 703 N.W.2d 204 (2005). Consequently, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459.

In *People v. McKinney*, 488 Mich. 1054, 1054; 794 N.W.2d 614 (2011), our Supreme Court held that the defendant's statement that he would "just as soon wait" until he had an attorney before talking to the police was not an unequivocal assertion of the right to counsel. Likewise, in *Tierney*, 266 Mich. App. at 711, this Court held that the defendant's statements, "Maybe I should talk to an attorney" and "I might want to talk to an attorney," were inadequate to assert the right to counsel. And in *People v. Adams*, 245 Mich. App. 226, 238; 627 N.W.2d 623 (2001), this Court held that the question,

15

"Can I talk to [a lawyer] right now?" was not an unequivocal invocation of the right of counsel. In *Adams*, this Court explained that this question merely represented "inquiries into the way the process worked" and was "not an actual demand for an attorney." *Id.*

In this case, after defendant was advised of his *Miranda* rights, he initially expressed his intent to ask for an attorney and not waive his rights, but he then stated that he would answer questions if he received written assurances that his sister would not be charged. The trial court found that defendant reinitiated a conversation with the police, and therefore waived his rights. The trial court found:

> [A]s soon as you invoked your right to a lawyer, you got up everything stopped. And you went back to your cell. That that statement – you had been given your rights because he was very clear to give you your rights before anything else occurred, and you then began to talk.
>
> And so your motion to suppress that statement is denied for the reasons that your rights had been given, and that you – and I believe that the law is clear that if you start to talk again then it's like you're waiving. You are, in fact, waiving your right to remain silent, and your right to have a lawyer at that time because you initiate the conversation. You initiated the conversation and made those statements.

The record reveals that after being advised of his rights, defendant indicated that he understood his rights and stated, "I'm not at this point waiving these rights." The detective asked defendant to write this on the "Remarks" section of the form. Without any prompting, defendant then said, "I will choose to answer the questions put to me; not a question on a question-by-question basis." The detective instructed

16

defendant to sign and date the advice-of-rights form. The following exchange ensued:

> Detective Jimenez. So, you want to answer just questions and you don't want to give yourself --
>
> Defendant. No. I'm just – I'm going to make a statement to you that if you were to bring me a deal on paper that allowed my sister to walk free, that I would sign it, and gladly tell you the details of whatever might have happened. Until that deal is on paper, I would not answer any questions.
>
> Detective Jimenez. Are you sure about that? That's your last offer?
>
> Defendant. That's my last offer; you put that deal on paper that's fine.
>
> So you can tell the Prosecutor that "Save a trial. Save everything, some deal to her and I'll ...."

After defendant was asked if he wanted to answer questions he stated "No," but immediately thereafter and without any prompting from the detective stated: "I'm going to make a statement to you that if you were to bring me a deal on paper that allowed my sister to walk free, that I would sign it, and gladly tell you the details of whatever might have happened." Defendant also told the detective he would choose to answer questions, but not on a "question-by-question basis."

The detective's inquiries during this exchange were not questions intended to elicit incriminating responses under *Innis*, 446 U.S. at 300–302; *White*, 493 Mich. at 195, but rather an attempt to clarify defendant's contradictory statements as to whether he intended to waive his right to answer questions. The record reveals that defendant had not been "interrogated" in violation of *Miranda* because he was

17

neither subjected to "express questioning" nor its "functional equivalent." *Innis*, 446 U.S. at 302–303. Similar to the facts in *Innis*, the entire conversation was short, the detective did not "harangue" defendant to try and get him to talk. Additionally, defendant initiated the conversation with the detective after stating to the detective that he did not want to talk, defendant, without prompting, immediately changed course and told the detective he did want to speak with him, albeit with certain conditions attached. As a consequence, we glean no record evidence that the detective took any action to coerce defendant into speaking to him. Additionally, the record is devoid of evidence that could lead us to conclude that defendant's reinitiating of the conversation was the direct product of direct questioning, intended to elicit a response. *See, Innis*, 446 U.S. at 303; *White*, 493 Mich. at 195–198. Rather, defendant, of his own choosing and without prompting, reinitiated a conversation with the detective, and as we have previously stated, if a suspect "reinitiates conversation" after asserting his right to counsel, law enforcement may ask questions. *Davis*, 512 U.S. at 457.

We next examine defendant's claim that he made a specific request for counsel, and as such, under *Miranda*, all questioning should have ceased. However, defendant's argument ignores the general and long-standing rule governing such requests, namely, if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, such references are not to be construed as an unambiguous request for counsel. *Davis*, 512 U.S. at 459. Rather, in order to assert the right to counsel under *Miranda* and its progeny, a suspect must unambiguously request counsel. As the Supreme Court observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S. 91, 97–98; 105 S. Ct. 490; 83 L. Ed. 2d 488 (1984). (brackets and internal quotation marks omitted). However, in order to operate as an assertion of the right to

18

counsel, a suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis*, 512 U.S. at 459. In *Moran v. Burbine*, 475 U.S. 412, 433, n. 4; 106 S. Ct. 1135; 89 L. Ed. 2d 410 (1986) the Supreme Court stated: "The interrogation must cease until an attorney is present only if the individual states that he wants an attorney." (citations and internal quotation marks omitted). Further, if the statement fails to meet the requisite level of clarity, case law does not require that the officers stop questioning the suspect. *See, Edwards v. Arizona*, 451 U.S. 477, 485; 101 S. Ct. 1880; 68 L. Ed. 2d 378 (1981).

Here, defendant's post-*Miranda* statements were admissible because he did not unequivocally assert his right to counsel. Rather, defendant, prior to any questioning or any prompting from law enforcement volunteered that if questioned, "I'm just going to ask for an attorney." The detective responded: "We haven't been to that place yet. I haven't read you your rights." Defendant again said: "I'm just going to ask for an attorney,[" ]to which the detective responded, "Go ahead."

Read in context, defendant's statements, "I'm going to ask for an attorney," reflect a desire by defendant to assert a right in the future. However, when the detective actually read defendant his rights under *Miranda*, defendant responded as quoted above by engaging in conversations about making a deal for his sister in exchange for his testimony. At no time prior to or after defendant was read his rights under *Miranda* did defendant make an unequivocal request for counsel. In the absence of an unequivocal assertion of his rights, law enforcement was not required to refrain from questioning him. *Davis*, 191 Mich. App. at 36. Accordingly, defendant is not entitled to relief on this issue.

*Govett*, 2020 WL 2501518, at \*7–9.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The record reveals that Govett did not clearly and unequivocally invoke his right to counsel or his right to remain silent while in police custody and subject to interrogation.

Govett first asserts that he invoked his right to counsel while being transported from the detention facility to the police department in New Jersey. At the hearing on his motion to suppress his custodial statement, Detective Moises Jimenez testified that while he spoke to Govett about his sister's arrest and confession and the issue of extradition during that approximately 15-minute drive, he did not question Govett about his involvement in the crime. 10/20/17 Mot. Hrg., ECF No. 10-5, PageID.282–284. When asked about whether Govett said that he wanted a lawyer during the car ride, Detective Jimenez replied: "He did say that he was going to want an attorney, because I told him, 'We don't have — We haven't been to that place, yet. I haven't read you, your rights.' He said, 'I'm just going to ask for an attorney.' I said, 'Go ahead.'" *Id.* at PageID.285.

The detective's testimony, if credited, indicates that Govett was not subject to interrogation in the car and that Govett did not unequivocally invoke his right to counsel, but rather indicated that he would do so in the future. Given the trial court's denial of the motion to suppress, 11/14/17 Mot. Hrg. Tr., ECF No. 10-9, PageID.441–443, it is clear that the court accepted the detective's, rather than Govett's, version of events. The trial court's factual findings and credibility determinations are presumed correct on habeas review, 28 U.S.C. § 2254(e)(1), and Govett has not rebutted that presumption with clear and convincing evidence. *Warren*, 161 F.3d at 360–361.

While Govett believes that the detective was trying to get him to make a statement during the car ride such that he was subject to "interrogation" at that time, the discussion about Govett's sister and extradition was not reasonably likely to elicit an incriminating response. To be sure, Govett did not make any incriminating statements that were admitted at trial during that ride. Because Govett was not subject to interrogation during the car ride, his right to counsel had not yet attached. *Miranda*, 384 U.S. at 444; *Innis*, 446 U.S. at 301.

21

Furthermore, even if the discussion could be seen as the functional equivalent of an interrogation, Govett's comment that he was "going to ask for an attorney" was not a clear and unambiguous request for counsel. *See, e.g., Davis*, 512 U.S. at 461–462 (suspect's statement that "maybe I should talk to a lawyer" was ambiguous); *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011) ("I think I should talk to a lawyer, what do you think?" was ambiguous); *Ledbetter v. Edwards*, 35 F.3d 1062, 1069–1070 (6th Cir. 1994) (statement that "it would be nice" to have an attorney was not a clear request); *Boles v. Foltz*, 816 F.2d 1132, 1135 (6th Cir. 1987) (request for an attorney at a future preliminary hearing was insufficient); *Matthews v. McKee*, No. 06-15253, 2009 WL 160291, at *9 (E.D. Mich. Jan. 22, 2009) (Rosen, J.) (remarks about meeting with a lawyer in the future and having one at a polygraph were not clear and unambiguous requests); *accord United States v. Shabaz*, 579 F.3d 815, 818–819 (7th Cir. 2009) (suspect asking an FBI Agent, "[A]m I going to be able to get an attorney?" as they entered an interview room before interrogation did not indicate a present desire to consult with counsel); *Clark v. Murphy*, 331 F.3d 1062, 1071–1072 (9th Cir. 2003) (state court ruling that statements "I think I would like to talk to a

lawyer" and "should I be telling you, or should I talk to an attorney?" were ambiguous was not unreasonable); *United States v. Uribe–Galindo*, 990 F.2d 522, 524 (10th Cir. 1993) (suspect did not invoke right to counsel by inquiring "whether he could have an attorney later on if he asked for one"); *Bradburn v. McCotter*, 786 F.2d 627, 630 (5th Cir. 1986) (declining to "extend *Edwards* to bar police contact with an accused who requests counsel at some future date"); *United States v. Sperling*, No. 08-00419, 2008 WL 11420065, *4 (M.D.N.C. Dec. 24, 2008) (finding that statements "I will be getting a lawyer," "I am going to get a lawyer," and "My parents will get me an attorney," suggested a future interest in counsel and were not unequivocal requests). Govett fails to establish that he was subject to interrogation and/or that he unequivocally invoked his right to counsel during the car ride.

Govett also asserts that he invoked his right to counsel (and his right to remain silent) during his interrogation at the police department. The recording/transcript reveals that after being advised of his *Miranda* rights, Govett stated that he did not want to waive those rights. 10/20/17 Mot. Hrg. Tr. ECF No. 10-5, PageID.56. Detective Jimenez asked him to note that in the "Remarks" section on the advice of rights form. *Id.* Govett

23

then stated that he would "choose to answer the questions put to me; not on a question-by-question basis." *Id.* Detective Jimenez sought clarification as to what Govett wanted to do and asked him whether he wanted to answer questions, and Govett responded, "No." Govett then, without prompting, went on to say that he would make a statement and tell Detective Jimenez the details of "whatever might have happened" if the detective brought him a written deal for his sister. *Id.* at PageID.57.

This exchange indicates that while Govett initially said that he did not want to waive his *Miranda* rights, he immediately stated that he would choose to answer questions put to him. When the detective sought clarification by asking Govett if he wanted to answer questions, which was permissible as it was not intended to elicit an incriminating response, *see Innis*, 446 U.S. at 300–302, Govett said no, but then went on to say that he would discuss the details of the crime if given a written deal for his sister. Given such circumstances, it cannot be said that Govett clearly and unequivocally invoked his right to counsel (or his right to remain silent) during this exchange. *See* discussion *infra.*

Moreover, to the extent that Govett may have done so by initially saying that he did not want to waive his *Miranda* rights, the record

24

indicates that he re-started the conversation by speaking to the detective unprompted. It is well-established that if a suspect reinitiates conversation with the police after asserting his *Miranda* rights, he waives his prior invocation of his rights and the police can continue the interrogation. *Davis*, 512 U.S. at 457–459.

Because Govett did not unequivocally invoke his right to counsel or his right to remain silent and—even if he had done so—chose to reinitiate his conversation with the detective, the trial court did not err in admitting his custodial statement into evidence. More importantly, for purposes of habeas review, the Michigan Court of Appeals' decision to that effect was reasonable. Habeas relief is not warranted on this claim.

### 2. Reference to Post-*Miranda* Silence

Govett next asserts that he is entitled to habeas relief because the prosecutor violated his due process rights by referencing his post-*Miranda* silence. Respondent contends that this claim is procedurally defaulted and that it lacks merit.

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has stated that "it is impermissible

25

to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." *Miranda,* 384 U.S. at 468 n.37. Thus, "it would be fundamentally unfair and a deprivation of due process" for the prosecution to call attention to an arrested person's silence. *Doyle v. Ohio,* 426 U.S. 610, 618 (1976). In other words, a prosecutor may not comment on a defendant's post-arrest silence in the case-in-chief, on cross-examination, or in closing arguments. *Id.* at 619–620; *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002).

The Michigan Court of Appeals considered this claim on plain error review and denied relief. The court explained:

> "As a general rule, if a person remains silent after being arrested and given Miranda warnings, that silence may not be used as evidence against that person." *Shafier*, 483 Mich. at 212, citing *Wainwright v. Greenfield*, 474 U.S. 284, 290–291; 106 S. Ct. 634; 88 L. Ed. 2d 623 (1986). "Therefore, in general, prosecutorial references to a defendant's post-arrest, post-*Miranda* silence violate a defendant's due-process rights under the Fourteenth Amendment of the United States Constitution." *Shafier,* 483 Mich. at 212–213, citing *Wainwright*, 474 U.S. at 290–291; *see also Doyle v. Ohio*, 426 U.S. 610, 618–620; 96 S. Ct. 2240; 49 L. Ed. 2d 91 (1976); *People v. Borgne*, 483 Mich. 178, 186; 768 N.W.2d 290 (2009). In *People v. Cetlinski,* 435 Mich. 742, 746–747; 460 N.W.2d 534 (1990), our Supreme Court held that "the use for

impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police, prior to arrest or accusation, does not violate the defendant's constitutional rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution." Further, "when an individual has not opted to remain silent, but has made affirmative responses to questions about the same subject matter testified to at trial, omissions from the statements do not constitute silence." *Id*. at 749.

In this case, the prosecutor stated during closing argument:

> He [defendant] has an ultimate right to remain silent, right. If he had chosen not to testify in this case, I wouldn't even be allowed to comment on it.
>
> You heard Detective Jimenez when they met in New Jersey go over his rights with him. And one of those rights was you have a right to remain silent. And Mr. Govett acknowledged that.
>
> He was well versed in the law. He knows what the *Miranda* rights are. He says I know what these mean. I'm choosing not to waive these rights. But if you give me a, a piece of paper that says my sister gets a deal, then I'll tell you about the facts on Sherwood Street.
>
> So that's the first time that we get a hint that he knows or that he may have information about what happened on Sherwood.

As discussed earlier, by offering to provide information after initially declining to waive his rights, defendant did not unequivocally assert his right to remain silent. Defendant reinitiated the discussion with the detective by stating that he would reveal his knowledge of what happened on Sherwood after his sister's situation was assured. Because defendant did

27

not unequivocally assert his right to remain silent, and instead affirmatively made statements suggesting that he could provide information about what happened on Sherwood, the prosecutor properly could comment on those statements, including any omissions. *Cetlinski*, 435 Mich. at 749.

Defendant also cites instances from the prosecutor's cross-examination that he argues were improper attempts to suggest that defendant's invocation of his right to silence made his self-defense claim not credible. The prosecutor played the video of defendant's discussion with the detective and asked defendant if he was deciding to exercise his right to remain silent. After several nonresponsive statements, defendant stated, "I'm not exercising my right to silence. I'm saying there's a condition to my cooperation." The prosecutor asked defendant if he told the police about self-defense immediately after receiving *Miranda* warnings, and if he stated his position before the detective asked him a question. The prosecutor asked, "And the thing that you said to him was a strategy on your part?" Defendant explained that he wanted to protect his sister from "overzealous prosecution." The prosecutor asked, "Is the self-defense story what had happened or is the self-defense story what your defense is going to be?" Defendant replied, "It's what happened" and he stated that he understood the distinction. Defendant did not object to these questions. We conclude, consistent with our earlier discussion, that the prosecutor's cross-examination was not improper because defendant waived his right to remain silent by affirmatively speaking and offering to provide information in exchange for his sister's favorable treatment. Indeed, defendant acknowledged at trial that he was "not exercising my right to silence." Defendant's omission of any self-defense claim comes within the *Cetlinski* holding that a defendant's omissions from voluntary statements may permissibly be used as impeachment. *Cetlinski*, 435 Mich. at 749.

28

Defendant also challenges several portions of the prosecutor's closing argument in which the prosecutor stated that defendant waived his right to remain silent and did not assert self-defense, and argued that defendant fabricated the self-defense story after learning what evidence the police had against him. These arguments do not single out defendant's post-*Miranda* silence. Rather, the arguments address defendant's failure to raise the self-defense claim before trial, including his failure to tell his sister. They emphasize that defendant's self-defense allegations did not emerge until defendant became aware of the evidence that would be offered against him. They attack defendant's credibility and the veracity of his claim of self-defense. A prosecutor properly may argue that a defendant is not worthy of belief, *Howard*, 226 Mich. App. at 548, and motive and opportunity to fabricate are permissible areas of inquiry and comment, *People v. Buckey*, 424 Mich. 1, 15; 378 N.W.2d 432 (1985). To the extent that the prosecutor's arguments addressed defendant's omissions in the discussion with the interviewing detective, they are acceptable because defendant waived his right to silence and omissions are acceptable impeachment. *Id.* As such, defendant is not entitled to relief on this issue.

*Govett*, 2020 WL 2501518, at *12–13.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The prosecutor's questions and arguments did not improperly reference Govett's post-*Miranda* silence because, as previously discussed, Govett did not unequivocally invoke his right to remain silent. Rather, he spoke to the police and acknowledged his involvement in the crime (without claiming that he acted in self-defense or defense of others as he testified

29

at trial). While *Doyle* bars references to a criminal defendant's post-*Miranda* silence, even for impeachment purposes, it does not apply to cross-examination that impeaches a defendant with his own prior inconsistent statements to police. *Anderson v. Charles*, 447 U.S. 404, 408 (1980). As the Supreme Court has explained, "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.*; *see also Pillette v. Berghuis*, 408 F. App'x 873, 880 (6th Cir. 2010); *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008).

A prosecutor may also argue that a testifying defendant is not worthy of belief and may comment on the defendant's opportunity to fabricate testimony after hearing the witnesses against him. *See Portuondo v. Agard,* 529 U.S. 61, 73 (2000) ("A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to

30

sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth.").

The prosecutor in this case did not improperly reference Govett's right to remain silent, but instead impeached Govett with his prior custodial statement and argued from the evidence that his claim of self-defense was not credible. Such conduct is permissible under *Anderson*. *See Dye v. Hofbauer*, 197 F. App'x 378, 386 (6th Cir. 2006) (prosecutor's reference to defendant's omission of facts he testified to at trial from his pre-arrest conversations with investigators was not "an improper comment" on his silence); *Stewart v. Trierweiler*, No. 15-11843, 2018 WL 3631986, at \*5 (E.D. Mich. July 31, 2018) (Berg, J.) (denying habeas relief on similar claim). Thus, Govett fails to establish a constitutional violation. Habeas relief is not warranted on this claim.

### 3.   Reference to Parolee Status

Govett next asserts that he is entitled to habeas relief because the prosecutor questioned a witness about Govett's status as a parolee and the trial court erred by admitting the testimony and not declaring a mistrial. Respondent contends that this claim is procedurally defaulted and that it lacks merit.

The Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly*); *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (confirming that *Donnelly/Darden* is the proper standard).

Additionally, alleged trial court errors in the application of state law are generally not cognizable as grounds for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Serra v. Michigan Dep't. of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *Estelle*, 502 U.S. at 69–70); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing

*Bey v. Bagley*, 500 F.3d 514, 519–520 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Lastly, it is well-settled that a trial court has broad discretion to grant or deny a motion for a mistrial—and a mistrial is only warranted upon a showing of manifest necessity. *See Arizona v. Washington*, 434 U.S. 497, 506–510 (1978) (mistrial due to deadlocked jury); *Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007). "Manifest necessity" means a "high degree" of necessity. *Arizona*, 434 U.S. at 506. The Supreme Court has confirmed the significant deference due a trial court's decision to grant or deny a mistrial, as well as the further deference due the state appellate court's decision on that issue, on federal habeas review. *See Renico*, 559 U.S. at 772–774 (reversing grant of habeas relief on claim contesting state trial court's grant of a mistrial due to a deadlocked jury).

The Michigan Court of Appeals considered this claim on plain error review and denied relief. The full discussion of that court's analysis of this issue is as follows:

> Before trial, the parties agreed that Amy Cassavoy could testify that an unnamed person called her trying to locate defendant. After further discussions, the prosecutor asked that Cassavoy be permitted to testify that it was defendant's parole officer who was looking for defendant for the limited purpose of showing that defendant failed to contact his parole

33

officer after the offense, which was relevant to show defendant's consciousness of guilt. The trial court allowed the testimony for this limited purpose. Cassavoy testified that she tried to contact defendant because a person was trying to reach him, but she did not know who the person was. The prosecutor asked, "Was it his parole officer?" She replied, "I don't recall." Her testimony continued:

> Q. What was the reason that you [sic] trying to contact [defendant] after he left?
>
> A. Someone was trying to, um, get ahold of him. I don't remember the name.
>
> Q. Uh, if you don't remember the person's name, do you remember who the person was that was trying to get in touch with him?
>
> A. No.
>
> Q. Okay. Was it his parole officer?
>
> A. Uh, I don't recall.
>
> * * *
>
> THE COURT. Well, Ms. Cassavoy, we had a conversation, uh, outside the presence of the jury just before the jury came out and I thought we were clear on this issue.
>
> Um, I don't take kindly to witnesses fudging their testimony under oath because you're under oath now.
>
> THE WITNESS. I understand that. But I though[t] you guys told me not to do it.
>
> THE COURT. No. We told you you could do it. You totally misunderstood the instructions.

34

* * *

THE WITNESS. I think that's – you know, you're, you're --

THE COURT. So now answer Mr. –

THE WITNESS: -- asking me to lie to begin with –

THE COURT. No. Nobody's asking you to lie.

THE WITNESS. – out in the hallway.

THE COURT. Nobody's ask – they're asking you, we're asking you not to lie. We're not –

THE WITNESS. Okay. Well then you guys brought up the issue don't let the jury know –

THE COURT. I just told you … go ahead and answer the questions honestly and completely. That's what I told you. That's what I told you. You just misunderstood it.

Cassavoy then stated that defendant's parole officer called trying to contact defendant.

## A. MISTRIAL

The basis of defendant's claim for a mistrial is that he was prejudiced by Cassavoy's testimony. Generally, a trial court "should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way." *People v. Lane*, 308 Mich. App. 38, 60; 862 N.W.2d 446 (2014) (quotation marks and citations omitted). As a general rule, "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *People v. Haywood*,

209 Mich. App. 217, 228; 530 N.W.2d 497 (1995). Cassavoy's statement about not wanting to lie was not responsive to any questioning. Nothing in the record provides a basis for a finding that the prosecutor expected Cassavoy to misunderstand the instructions and would express confusion. Moreover, Cassavoy's statement was not prejudicial to defendant. Contrary to what defendant asserts, her responses did not suggest that it was defendant who was trying to mislead the jury. First, her remarks were made in response to questioning by the prosecutor. Second, when Cassavoy expressed confusion about what she was permitted to say, the trial court remarked that "we had a conversation," "we told you you could do it," and "we're not asking you to lie," and Cassavoy remarked that she thought "you guys told me not to do it" and "you guys brought up the issue." These responses did not suggest that defendant was trying to mislead the jury. Accordingly, there was no basis for a mistrial.

Although the trial court indicated that it would instruct the jury that the parole testimony could be considered only to show defendant's consciousness of guilt, there is no indication in the record that such an instruction was given. However, defendant did not object to the trial court's instructions. We conclude that the omission of a jury instruction did not affect defendant's substantial rights because (1) the jury was already aware that defendant was a convicted felon because of the felon-in-possession charge, (2) the nature of defendant's parole offense was not disclosed, and (3) there is no suggestion that the prosecutor urged the jury to consider the evidence for an improper purpose. Accordingly, defendant is not entitled to relief on this basis.

## B. EVIDENTIARY ISSUE

In his Standard 4 brief, defendant argues that the testimony that his parole officer was trying to contact him should have been excluded because it was inadmissible under MRE 404(b)(1) and because it was unduly prejudicial under MRE

36

403. Although defendant argued below that the testimony should be excluded under MRE 403, he did not argue that it was inadmissible under MRE 404(b)(1). Therefore, we review the trial court's MRE 403 ruling for an abuse of discretion, *People v. Watkins*, 491 Mich. 450, 467; 818 N.W.2d 296 (2012), and we review defendant's MRE 404(b)(1) claim for plain error affecting defendant's substantial rights, *People v. Brown*, 326 Mich. App. 185, 195; 926 N.W.2d 879 (2018).

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

It is a "deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." *People v. Denson*, 500 Mich. 385, 397; 902 N.W.2d 306 (2017). "This rule reflects the fear that a jury will convict a defendant on the basis of his or her allegedly bad character rather than because he or she is guilty beyond a reasonable doubt of the crimes charged." *Id*. Admission of other-acts evidence involves the following considerations:

First, the prosecutor must offer the "prior bad acts" evidence under something other than a character or propensity theory. Second, "the evidence must be relevant under MRE 402, as enforced through MRE 104(b)[.]" Third, the probative value of the evidence must not be substantially outweighed by unfair prejudice under MRE 403. Finally, the trial court, upon

37

request, may provide a limiting instruction under MRE 105. [*People v. Knox*, 469 Mich. 502, 509; 674 N.W.2d 366 (2004), quoting *People v. VanderVliet*, 444 Mich. 52, 74–75; 508 N.W.2d 114 (1993).]

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Generally, relevant evidence is admissible except as otherwise provided by law. MRE 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." MRE 403.

To the extent that the evidence of defendant's parole status was evidence of a prior bad act, it was not inadmissible under MRE 404(b)(1) because it was not offered to prove propensity. The prosecutor offered the evidence to show defendant's consciousness of guilt. Defendant's failure to respond to the urgent message that he was violating his parole was relevant to show his consciousness of guilt. Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. Defendant stipulated to the fact that he had a prior felony conviction that rendered him ineligible to possess a firearm. That stipulation reduced the prejudicial impact of the evidence that defendant was still on parole. Further, the nature of the offense for which defendant was on parole was not disclosed. The trial court did not abuse its discretion by ruling that any prejudicial effect arising from the testimony did not substantially outweigh its probative value. Thus, the trial court did not err by allowing the evidence at trial.

*Govett*, 2020 WL 2501518, at \*9–11 (footnote omitted).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.

38

First, the prosecutor did not engage in misconduct by eliciting this testimony. The trial court initially ruled that Cassavoy could testify that "someone" was looking for Govett, 12/11/17 Trial Tr., ECF No. 10-11, PageID.400, but subsequently amended that decision and ruled that Cassavoy could testify that Govett's parole officer was looking for him as evidence of the urgency to contact him and consciousness of guilt. 12/13/17 Trial Tr., ECF No. 10-13, PageID.886–889. A prosecutor's good faith effort to admit evidence does not constitute misconduct, particularly where, as here, the trial court admits the evidence. *See Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008) ("A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings."). Additionally, the Michigan Court of Appeals ruled that the testimony was properly admitted under state law. The prosecutor's questions and arguments were based on the trial court's rulings, the properly admitted testimony, and reasonable inferences therefrom, e.g., to show consciousness of guilt. Prosecutors may argue reasonable inferences from the evidence. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Govett fails to establish that the prosecutor engaged in misconduct which rendered his trial fundamentally unfair.

Second, to the extent that Govett alleges that the admission of this testimony violated the Michigan Rules of Evidence and challenges the Michigan Court of Appeals' interpretation of state law, he is not entitled to relief. It is well-settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). Habeas relief does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67–68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Third, Govett fails to establish a due process violation. As to the admission of other acts evidence, the Supreme Court has declined to hold that "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *Dowling v. United States*, 493 U.S. 342, 352–353 (1990). Thus, "[t]here is no clearly established Supreme Court precedent which holds that a State violates due process

40

by permitting propensity evidence in the form of other bad acts evidence."

*Bugh*, 329 F.3d at 512. Consequently, there is no Supreme Court precedent that the Michigan Court of Appeals' decision can be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id.* at 513; *Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003) (Tarnow, J.); *see also Ward v. Macauley*, No. 21-12773, 2025 WL 952476, *3 (E.D. Mich. Mar. 28, 2025) (Hood, J.) (denying habeas relief on similar claim).

Lastly, given that the disputed testimony was admissible under state law, that the jury was aware of Govett's status as felon due to the felon in possession charge, and that the prosecutor never urged the jury to convict Govett based upon any propensity to commit crimes, his criminal history, or his parole status, Govett fails to establish that the admission of the testimony rendered his trial fundamentally unfair—or that manifest necessity warranted a mistrial. Habeas relief is not warranted on this claim.

### 4. Suppression of Evidence & Access to Discovery

Lastly, Govett asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by withholding exculpatory evidence and by not making discovery materials reasonably available before trial. Respondent contends that these claims are procedurally defaulted (in part) and that they lack merit.

It is well-settled that there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432–436 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993). The duty to disclose favorable evidence

includes the duty to disclose impeachment evidence. *Bagley*, 473 U.S. 667; *Giglio v. United States*, 405 U.S. 150, 154–155 (1972). While due process requires a prosecutor to disclose exculpatory evidence, it "does not require the government to create exculpatory material that does not exist." *Stadler v. Curtin*, 682 F. Supp. 2d 807, (E.D. Mich. 2010) (Lawson, J.) (citing cases); *see also Dallas v. Holmes*, 137 F. App'x 746, 754 (6th Cir. 2005).

The *Brady* rule only applies to "the discovery, after trial[,] of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure. *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986). Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of guilt. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). The petitioner bears the burden of establishing a *Brady* violation. *Id.*

43

The Michigan Court of Appeals considered these claims on direct appeal and denied relief. The court explained in relevant part:

## II. SUPPRESSION OF DNA EVIDENCE

In his brief on appeal, defendant argues that the prosecutor violated his right to due process by withholding exculpatory DNA evidence in violation of *Brady v. Maryland*, 373 U.S. 83; 83 S. Ct. 1194; 10 L. Ed. 2d 215 (1963). Defendant asserts that the prosecutor failed to disclose defendant was excluded as the donor of DNA on swabs of various items and areas inside the Sherwood house. The prosecutor testified at a posttrial evidentiary hearing that all reports were provided to defendant, and that several swabs were never forwarded to the crime lab for analysis because they were not believed to be of evidentiary value.

***

The prosecutor is required to disclose material evidence favorable to the defense. *Brady*, 373 U.S. 83; *People v. Fox* (After Remand), 232 Mich. App. 541, 549; 591 N.W.2d 384 (1998). Failure to provide exculpatory information to a defendant violates a defendant's right to due process. *Brady*, 373 U.S. at 87; *People v. Schumacher*, 276 Mich. App. 165, 176; 740 N.W.2d 534 (2007). To establish a *Brady* violation, a defendant must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) viewed in its totality, the evidence was material. *People v. Chenault*, 495 Mich. 142, 155; 845 N.W.2d 731 (2014)[.]

The assistant prosecutor who tried the case (the prosecutor) testified at the evidentiary hearing that Lori Nielsen's technician's report listed the items she collected from the Sherwood house, including several swabs. This was not a list of swabs submitted for DNA analysis, because Nielsen did not make the decision about which items to test. The prosecutor explained that the crime lab generally will not analyze 20 to 30 or more swabs, so the prosecutor usually identifies which

44

items are most likely to have evidentiary value. According to the prosecutor, defendant was provided with Nielsen's reports, including reports indicating which swabs were tested for DNA. There was no secondary report that the prosecutor received but did not disclose to defendant. At trial, defendant denied receipt of a "case supplemental report" from Nielsen before trial, but the prosecutor asserted that the report was provided to defendant along with all other reports. At the evidentiary hearing, the prosecutor explained that Nielsen's reports were reformatted when printed for discovery, so the reports in the prosecutor's binder looked different than the reports provided to defendant, but the content was identical. The trial court found this explanation credible and found that the prosecutor did not withhold any evidence.

Our review of the record evidence submitted leads us to conclude that the trial court's finding that defendant was provided all of the prosecutor's reports relative to the DNA testing was not clearly erroneous. MCR 2.613(C). Therefore, defendant failed to satisfy the first requirement, namely, that the prosecutor suppressed evidence.

Additionally, defendant has not shown that the challenged evidence was material. "To establish materiality, a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Chenault*, 495 Mich. at 150 (citation omitted). Defendant does not clearly explain the materiality of DNA evidence. The prosecutor did not rely on DNA evidence to establish defendant's guilt, but principally relied on the testimony of Miller and Hering. Defendant suggests that he assumed that his DNA was found on mattresses or dresser drawers, but this assumption was not founded on anything the prosecutor said or argued. Defendant also implies that evidence regarding Hering's DNA, but not defendant's DNA, existed on these objects which would have

been material had such evidence been produced, or existed. However, the jury was already aware from the testimony that defendant's DNA was not found, but that defendant had used bleach to clean several items, and that Hering participated in the ransacking of the house after the offenses and returned later to search for drugs and steal McBride's phone. Moreover, the ransacking of the house was secondary to the bludgeoning, shooting, and thefts, all of which defendant admitted. To the extent defendant advances an argument that he could have devoted more attention to proving his state of mind if he did not have to address the ransacking evidence, we find such an argument devoid of merit. Defendant has failed to identify any record evidence from which this Court could conclude that his alleged concern about the possible presence of DNA and the ransacking evidence precluded him from offering his testimony that he killed Nicaise, Bouford, and McBride out of fear for himself and his sister.

In the absence of evidence that the prosecutor suppressed evidence coupled with the failure by defendant to demonstrate that the alleged evidence was favorable or exculpatory relative to his defense, the trial court did not abuse its discretion by denying defendant's motion for a new trial.

## III. ACCESS TO ELECTRONIC DISCOVERY

Defendant next argues in his appeal that his due-process rights were violated because he was not provided an adequate opportunity to review electronic discovery materials before trial…. Defendant also raises related claims of a *Brady* violation and ineffective assistance of counsel….

The factual premise of this claim is that defendant's standby counsel did not have a laptop computer to facilitate his review of discovery materials, and that defendant had only a limited opportunity to review the materials. Because defendant does not contend that the prosecutor failed to disclose any of the materials, his claim of a *Brady* violation is without merit,

given that no evidence was suppressed. *Chenault*, 495 Mich. at 155.

***

The record reveals that that arrangements were made to provide a laptop computer for defendant and standby counsel to use, and defendant was able to use the laptop to view videos in the witness room or jury room. Accordingly, the record is devoid of any basis on which we could conclude that standby counsel's lack of a computer affected the outcome of this matter.

Additionally, analyzing defendant's claim as a general due-process claim, "principles of due process are implicated where there is a claim of lack of adequate time to prepare for trial." *People v. Suchy*, 143 Mich. App. 136, 142; 371 N.W.2d 502 (1985), leads us to a similar conclusion. Again, the record discloses that arrangements were made for defendant to review the electronic discovery materials on a laptop, and that defendant had at least two days to review the videos, with each session lasting several hours. The prosecutor testified at the evidentiary hearing that he verified that defendant was able to view and hear the videos before he left. Accordingly, the record does not support defendant's claim of a due-process violation, and the trial court did not abuse its discretion by denying defendant's motion for a new trial with respect to this issue.

*Govett*, 2020 WL 2501518, at *2–4 (state law review and ineffective assistance of counsel standards omitted).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.

First, to the extent that Govett asserts that the prosecutor violated state discovery rules or a state court order, such a claim is not cognizable

47

on habeas review. As noted, there is no constitutional right to discovery in a criminal case. *Weatherford*, 429 U.S. at 559. An alleged violation of state discovery rules raises a state law issue which is not cognizable on habeas review. *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *Burns v. Lafler*, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004) (Gadola, J.). State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis*, 497 U.S. at 780; *Oviedo*, 809 F.2d at 328; *see also Bradshaw*, 546 U.S. at 76; *Sanford*, 288 F.3d at 860. Habeas relief does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67–68.

Second, Govett fails to demonstrate that his federal constitutional rights were violated. As discussed by the Michigan Court of Appeals, the record belies his claim that favorable and material evidence was suppressed by the prosecutor. With respect to the DNA evidence, Govett fails to show that the prosecutor suppressed evidence. The record indicates that Govett admitted that he had access to the DNA lab reports, 2/22/19 Evid. Hrg. Tr., ECF No. 10-18, PageID.1530–1531, and the prosecutor provided a paper copy of his entire discovery file, including the police reports and evidence technician reports, to standby defense

48

counsel (per the trial judge's order due to logistics) before trial. *Id.* at PageID.1555–1560. Govett also fails to show that any such evidence was material or exculpatory. To be sure, Govett admitted his presence at the scene and his participation in the crime when he testified at trial. 12/18/17 Trial Tr., ECF No. 10-15, PageID.1188–1216.

Similarly, as to the electronic evidence, Govett fails to show that such evidence was suppressed. Rather, the record indicates that the prosecutor gave the evidence, and a laptop to review the evidence, to Govett and standby counsel at the time of trial, that they were given time to review it, and that they did so before trial. 2/22/19 Evid. Hrg. Tr., ECF No. 10-18, PageID.1508–1509, 1540–1543. Additionally, Govett fails to allege and/or show that such evidence was exculpatory or favorable to the defense. Govett fails to establish a *Brady* violation. Habeas relief is not warranted on these claims.

## IV.   CONCLUSION

For the reasons stated, the Court concludes that Govett is not entitled to habeas relief on his claims. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the habeas petition.

Before Govett can appeal, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies habeas relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484–485 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Govett makes no such showing. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court concludes that an appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a). Accordingly, the Court **DENIES** leave to proceed in forma pauperis on appeal. This case is closed.

51

**IT IS SO ORDERED**.

BY THE COURT:

Dated: March 23, 2026

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge